# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | NO. 3:19-cr-00311 |
| v. ) | |
| ) | JUDGE CAMPBELL |
| ) | |
| DAVID DWIGHT MARTIN ) | |

## MEMORANDUM AND ORDER

### I. INTRODUCTION

Pending before the Court are Defendant's Motion to Suppress (Doc. No. 31), and the Government's Response (Doc. No. 35). Through the Motion, Defendant challenges two separate searches – one on September 3, 2019 and one on December 4, 2019 – each of which led to discovery of the firearms referenced in the Superseding Indictment. Defendant seeks to suppress those firearms. The Court held a hearing on the Motion on August 12, 2020. The parties chose not to file post-hearing briefs. For the reasons stated below, the Motion to Suppress (Doc. No. 31) is **DENIED.**

### II. EVIDENCE ADDUCED AT THE HEARING

A. Search on September 3, 2019

At the hearing on the Motion, the Government called Officer Jessica Gistarb, who works as a patrol officer for the Goodlettsville Police Department. (Doc. No. 44, at 7-8). Officer Gistarb testified that, on the evening of September 3, 2019, she stopped a car driven by Defendant in Goodlettsville, Tennessee, for failing to stop at a red light. (*Id.,* at 10-11). Before exiting her

vehicle, Officer Gistarb observed the driver digging inside a bag in the back seat. (*Id.,* at 12-13). Officer Gistarb also observed a passenger in the car. (*Id.*) Officer Gistarb approached the car from the passenger side, and asked Defendant for his driver's license, registration, and proof of insurance. (*Id.,* at 14). Defendant told the officer he needed to retrieve his license from the black bag in the center of the back seat. (*Id.,* at 14-16). After Defendant and the passenger gave her their driver's licenses, Officer Gistarb returned to her patrol car and checked to see if the licenses were valid and to see if there were any outstanding warrants. (*Id.,* at 16-17). She found that Defendant was the subject of an outstanding warrant for aggravated assault. (*Id.,* at 17).

Once he heard about the outstanding warrant on the radio, Officer Gistarb's sergeant, Matthew Shoesmith, arrived at the scene to assist her. (*Id.,* at 17-18). Officer Gistarb then approached the driver's side of the car, asked Defendant to exit the car, and told him he had an outstanding warrant. (*Id.,* at 18). Officer Gistarb testified that Defendant was sweating and nervous. (*Id.*) Officer Gistarb placed Defendant under arrest, handcuffed him, and then searched his person while they were standing near the trunk of his car. (*Id.,* at 19-20). Officer Gistarb discovered a white powdery substance in a clear baggie in Defendant's left shorts pocket. (*Id.,* at 20-21). Defendant said the substance was a laxative, but Officer Gistarb testified that the substance was actually cocaine, based on the results of a subsequent field test. (*Id.,* at 21). Based on that discovery, Officer Gistarb charged Defendant with a drug offense. (*Id.*) In the right pocket of Defendant's shorts, Officer Gistarb discovered a scales with a white powdery substance and a green leafy substance on it. (*Id.,* at 21-22). Officer Gistarb testified Defendant told her he had the scales because he did not want people to cheat him when he purchased drugs. (*Id.,* at 22-23). Based

2

on the discovery of the scales, Officer Gistarb also charged Defendant with possession of drug paraphernalia. (*Id.,* at 23).

Officer Gistarb believed she had probable cause to search the car based on the presence of the cocaine, scales, Defendant's lie about the cocaine being a laxative, Defendant's nervousness, and Defendant's reaching for the bag in the back seat before the stop. (*Id.,* at 23-25). In the vehicle's center console, Officer Gistarb discovered a marijuana cigar, a dollar bill with a white powdery substance on it, and a baggie with a white powdery substance. (*Id.,* at 26). In the bag in the back seat where Defendant retrieved his driver's license, Officer Gistarb discovered a Hi-Point .40 caliber weapon with the magazine and bullets in the chamber. (*Id.* at 26-27). After discovering the weapon, Officer Gistarb checked Defendant's criminal history and learned he had two prior felony convictions. (*Id.,* at 27). Based on that discovery, Officer Gistarb charged Defendant with unlawful possession of a firearm by a convicted felon. (*Id.*)

On cross examination, Officer Gistarb testified that she could not recall how she obtained the registration information for the vehicle, but learned from that information that the vehicle belonged to the passenger, Randelya Parker. (*Id.*, at 14, 30-31). Officer Gistarb placed Defendant in the back of her patrol car before she searched the vehicle. (*Id.*, at 35). During that time, Sergeant Shoesmith confirmed that Ms. Parker would be able to drive the car away so it would not have to be towed. (*Id.*, at 36). Results from the lab test for the white powder Officer Gistarb discovered showed the substance was heroin and cocaine. (*Id.*, at 39).

Detective Stanley Hilgadiack of the Goodlettsville Police Department testified that the lab results confirmed the substances seized from the defendant and the vehicle as heroin and cocaine. (*Id.*, at 82-84).

3

Search on December 4, 2019

Detective Hunter Fikes of the Metropolitan Nashville Police Department testified that he was on patrol with the flex unit on December 4, 2019, at approximately 12:20 a.m., when he encountered the defendant in the Germantown area. (*Id.*, at 41, 43-44). Detective Fikes was patrolling with Officer William Erickson, who was riding in the passenger seat of the patrol car. (*Id.*, at 43-44). Detective Fikes observed a car pass him with its high beam lights on, and he turned around to follow the car to a red light, where both cars stopped. (*Id.*, at 45-46). Detective Fikes testified that there is a law requiring drivers to dim their headlights to oncoming traffic. (*Id.*, at 47). But he did not stop the car at that point. (*Id.*) While waiting for the red light to change, however, Detective Fikes noticed that the license tag of the car had expired in June 2019. (*Id.*) To confirm this observation, Detective Fikes asked Officer Erickson to run the tag on the computer. (*Id.*, at 48-49). Officer Erickson confirmed the expired tag. (*Id.*, at 51-52). Detective Fikes testified that there is a law prohibiting driving an unregistered vehicle. (*Id.*, at 49-51). At that point, Detective Fikes decided to stop the vehicle for the high beam violation and the expired tag violation. (*Id.*, at 52).

After the traffic light turned green, Detective Fikes activated his blue lights and siren and stopped the vehicle, which he described as a blue BMW 325. (*Id.*, at 52-53). Detective Fikes approached the vehicle from the driver's side, and Officer Erickson approached from the passenger side. (*Id.*, at 53). As he approached, Detective Fikes observed a passenger in the back seat sitting directly behind the driver, who he later determined was the defendant. (*Id.,* at 53-54). Detective Fikes testified that there was also an individual in the passenger seat, in addition to the driver. (*Id.*, at 55). Detective Fikes stopped near the defendant's door to speak with him, while Officer Erickson

4

spoke with the driver and front seat passenger. (*Id.*, at 55-56). Officer Erickson explained the reason for the stop, and requested the driver's license, registration, and proof of insurance. (*Id.*, at 55-56). Detective Fikes shined a flashlight in and knocked on the defendant's window. (*Id.*, at 57). After Defendant rolled the window down, Detective Fikes testified that he observed a clear plastic baggie, containing a green, leafy substance appearing to be marijuana, in the defendant's left pants pocket. (*Id.*, at 57-58). Detective Fikes then asked Defendant for identification, and the defendant complied. (*Id.*, at 58-59). Detective Fikes asked the defendant what was in the plastic bag, and said the defendant "hung his head" and told him, "it's weed man." (*Id.*, at 59). At this point, Officer Erickson was still at the passenger side window, and had not obtained the license, registration, and insurance information he had requested. (*Id.*) Detective Fikes asked the defendant to give him the plastic bag, and he complied. (*Id.*, at 60). Detective Fikes observed white pill-like bars in the baggie, as well as a crystal-like rock substance, and placed the baggie on top of the car. (*Id.*)

Detective Fikes then asked the defendant to step out of the car, and as he did so, the detective observed a black handgun sitting on the floorboard where the defendant's feet had been. (*Id.*, at 60-62). Detective Fikes described the handgun as a Springfield Armory XDS .45 caliber. (*Id.*, at 61). Detective Fikes placed the handgun on top of the vehicle, then handcuffed the defendant. (*Id.*, at 62, 63). At this point, Detective Fikes testified, Officer Erickson had not run the driver's license check, had not verified the VIN number on the vehicle with the registration information, and had not checked the insurance information. (*Id.*, at 63-64). Detective Fikes testified that he decided not to issue a citation to the driver because she was having financial issues and had not had the money to renew her vehicle registration. (*Id.*, at 65). At some point during the traffic stop, Detective Fikes learned that the defendant was a convicted felon. (*Id.*, at 66). Detective

5

Fikes ultimately charged the defendant with a narcotics offense, and unlawful possession of a firearm by a convicted felon. (*Id.*)

On cross examination, Detective Fikes acknowledged that the incident report and the arrest report for the stop state the reason for the stop was expired tags, and do not mention high beams. (*Id.*, at 79).

### III. ANALYSIS

With regard to the September 3, 2019 stop, the Government argues the search was lawful based on the "automobile exception."[1] The Supreme Court has long recognized an exception to the warrant requirement with regard to automobile searches. *See, e.g., United States v. Smith,* 510 F.3d 641, 647 (6th Cir. 2007). The exception "is justified not only by the exigency created by the 'ready mobility' of vehicles, but also by the lesser expectation of privacy operators have in their vehicles." *Id.*, at 650. Under the "automobile exception," officers may conduct a warrantless search of a vehicle if they have probable cause to believe the vehicle contains evidence of a crime or contraband. *Id.,* at 647; *United States v. Keeling*, 783 Fed. Appx. 517, 523 (6th Cir. 2019).

Probable cause exists where "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Keeling,* 783 Fed. Appx. at 523 (quoting *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002)). Courts are to "evaluate whether the facts satisfy 'this practical and common-sensical standard' by looking at 'the totality of the circumstances.'" *Id.* (quoting *Florida v. Harris,* 568 U.S. 237, 244, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013)).

The Government argues the officers had probable cause to search the car because: (1) narcotics and a set of scales with drug residue were found on the defendant's person; (2) the

---

[1] Defendant does not appear to contest the initial traffic stop for failing to stop at a red light.

defendant lied when he told the police the cocaine was a laxative; and (3) the defendant appeared nervous. The Government cites *United States v. Guy,* 1 Fed. Appx. 410, 413 (6th Cir. 2001) to support its argument. In *Guy,* an officer found the defendant asleep in his car on the side of the road with a "crank pipe" used for smoking methamphetamine in his hands. *Id.,* at 411. After awakening the defendant and arresting him for DUI and possession of the pipe, the officers discovered a small bag of methamphetamine in his pocket. *Id.* The officers then searched the car, as well as a duffel bag within the car, and found more methamphetamine and firearms. *Id.*, at 411-12. In upholding the vehicle search, the Sixth Circuit determined the officers had probable cause to search the car because:

> Wampler first found Guy asleep with a crank pipe in his hands. The officers then arrested Guy for possession of the pipe and Driving Under the Influence. As a result, the officers had probable cause to believe that contraband would be found in his car.

*Id.,* at 413. The court explained that "under the law of our circuit, 'where police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it.'" *Id.,* at 413 (quoting *United States v. Mans,* 999 F.2d 966, 969 (6th Cir. 1993)).

Defendant argues the officers did not have probable cause to search the car. Defendant points out that he was already out of the car when officers found the cocaine and scales in his pocket, and he explained the scales by telling officers he used them to make sure he is not cheated when buying drugs. Defendant contends there was no reason to believe the vehicle would contain evidence of drug dealing because the arrest warrant was for aggravated assault, not for a drug crime, and the small quantity of drugs on his person could have simply been for personal use and

7

all he possessed. Defendant cites *United States v. McPhearson,* 469 F.3d 518 (6th Cir. 2006) to support his argument. In *McPhearson,* police arrested the defendant on the front porch of his home, and recovered drugs on his person during the ensuing pat-down search. 469 F.3d at 520. Based on that discovery, the officers obtained a search warrant for the residence to search for evidence of drug trafficking. *Id.,* at 521. The Sixth Circuit held the warrant was without probable cause because the affidavit "did no more than state that McPhearson, who resided at [the residence to be searched], was arrested for a non-drug offense with a quantity of crack cocaine on his person." *Id.,* at 524. The court explained that "[a] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." *Id.*

The Court is persuaded the officers had probable cause to search the vehicle under the "automobile exception." Officer Gistarb found cocaine and scales on the defendant's person immediately after the defendant exited the vehicle. Therefore, the officer had probable cause to believe the vehicle contained contraband. To the extent Defendant argues probable cause is diminished by the fact that he did not own the vehicle, he has failed to show his connection was so attenuated that officers had no probable cause to believe he had possessions inside the vehicle. After all, Defendant was driving the vehicle when it was stopped. As for Defendant's argument that officers needed to have probable cause to believe evidence of drug "dealing" was in the vehicle, Defendant has failed to cite authority to that effect. Probable cause does not require a showing that the vehicle likely contained evidence of drug "dealing;" it only requires a fair probability that more contraband would be found in the car. *See United States v. Church*, 823 F.3d 351, 355, 2016 WL 2865736 (6th Cir. 2016) (explaining that probable cause may be based on

8

likely presence of illegal drugs; it need not be based on the likely presence of drug trafficking evidence). Possession of cocaine is illegal, and Defendant's possession of the cocaine, along with the scales, on his person provided probable cause to believe there would be more narcotics in the vehicle. Defendant's motion to suppress evidence obtained during the September 3, 2019 search is denied.

With regard to the December 4, 2019 search, Defendant argues the initial traffic stop violated the Fourth Amendment because the officers did not have probable cause of a civil infraction or traffic violation, and they did not have reasonable suspicion of criminal activity.[2] A traffic stop is a "seizure" within the meaning of the Fourth Amendment, and if the stop is illegal, evidence obtained as a result of the stop must ordinarily be suppressed. *See, e.g., United States v. Macklin*, No. 19-6462, 2020 WL 4049751, at *3 (6th Cir. July 20, 2020). An officer must have "probable cause" to stop a vehicle for a civil infraction, and "reasonable suspicion" of an ongoing crime to stop for a criminal violation. *Id.; see also United States v. Jones,* 953 F.3d 433, 437 (6th Cir. 2020) (holding that reasonable suspicion of a completed misdemeanor may, in some circumstances, justify an investigatory stop).

Once a vehicle is lawfully detained, an officer may order the driver to get out of the vehicle. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977). An officer may also order passengers out of a vehicle pending completion of a valid traffic stop. *Maryland v. Wilson,* 519 U.S. 408, 415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997).

---

[2] Defendant points out that a passenger in a vehicle has standing to challenge the seizure of the vehicle for a traffic stop, citing *Brendlin v. California,* 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). The Government does not appear to contest standing.

The Government argues the officers observed expired tags, a violation of Tennessee Code Annotated Sections 55-4-104 and 55-3-102, on the vehicle in which Defendant was riding. Based on that civil infraction, the Government argues the officers had probable cause to stop the vehicle. At the hearing, Defendant argued that the basis for the stop was not clear because Detective Fikes said he stopped the vehicle for failing to dim its high beam headlights when the incident and arrest reports state the reason for the stop was for expired tags.

The Court is not persuaded there is a discrepancy in the evidence. As set forth above, Detective Fikes testified that, although he began to follow the vehicle in which Defendant was riding after he noticed the high beam violation, he did not initiate the traffic stop until he observed, and confirmed, the expired tags. Thus, Detective Fikes' testimony and the reports he drafted are not inconsistent. Having observed the civil infraction for expired tags, Detective Fikes had probable cause to stop the vehicle in which Defendant was riding.

Defendant alternatively argues that, even if the traffic stop was legal, the police wrongfully prolonged the seizure by taking a "detour" to investigate the passenger, rather than immediately investigating and processing the traffic violation. The Supreme Court has held that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," and attend to related safety concerns. *Id.*; *Rodriguez v. United States*, 575 U.S. at 354. "Because addressing the infraction is the purpose of the stop, it may "'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* "Authority for the seizure thus ends

10

when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*; *United States v. Sharpe,* 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation.")

On the other hand, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop. . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *see also Caballes,* 543 U.S. at 409-10 (holding no Fourth Amendment violation where dog sniff was performed on the exterior of car while the defendant was lawfully seized for a traffic violation).

The Supreme Court has described the "mission" of the officer during a traffic stop as follows:

> Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' *Caballes,* 543 U.S., at 408, 125 S. Ct. 834. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware v. Prouse,* 440 U.S. 648, 658–660, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979). See also 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507–517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse,* 440 U.S., at 658–659, 99 S. Ct. 1391; LaFave, Search and Seizure § 9.3(c), at 516 (A 'warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.').

*Rodriguez,* 575 U.S. at 355. Prolonging a stop beyond that mission for even seven or eight minutes in order to permit a dog to sniff for narcotics violates the Fourth Amendment. *Id.,* at 355-58.

"'Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have

11

a reasonable and articulable suspicion that criminal activity is afoot.'" *United States v. Calvetti,* 836 F.3d 654, 665 (6th Cir. 2016) (quoting *United States v. Davis,* 430 F.3d 345, 353 (6th Cir. 2005)). In determining whether an officer had developed reasonable suspicion of criminal activity, the court is to consider the totality of the circumstances. *Id.*

The Government argues the officers had not "completed the mission" of the traffic stop at the time the firearm was observed by Detective Fikes.[3] The Court agrees. Detective Fikes testified that Officer Erickson was still obtaining license, registration, and insurance information from the driver when he first saw the baggie hanging out of the defendant's pocket, and the defendant admitted it contained marijuana. He also testified that, when he saw the handgun in plain view where Defendant's feet had been, Officer Erickson had not yet run the driver's license check, nor had he confirmed the registration and insurance information. Thus, Defendant has not shown the officers discovered the contraband and firearm after they wrongfully prolonged the seizure. Accordingly, Defendant's motion to suppress the evidence obtained during the December 4, 2019 traffic stop is denied.

### IV. CONCLUSION

For the reasons set forth above, the Motion to Suppress (Doc. No. 31) is **DENIED.**

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

---

[3] Defendant does not appear to challenge the officer's reliance on "plain view" as a basis for seizing the weapon. *See, e.g., United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (explaining that under the plain-view doctrine, police may seize an object without a warrant if they are in a lawful position when they view it and its incriminating character is immediately apparent; also holding that a motorist has no legitimate expectation of privacy in shielding the interior of an automobile that may be viewed by diligent police officers).